713 So.2d 937 (1997)
Fob JAMES, Jr., in his official capacity as Governor of the State of Alabama and as president of the State Board of Education, et al.
v.
ALABAMA COALITION FOR EQUITY, INC., an Alabama nonprofit corporation, et al.
Fob JAMES, Jr., in his official capacity as Governor of the State of Alabama and as president of the State Board of Education, et al.
v.
Mary HARPER, suing as next friend of Deion Harper and Perry Phillips, minors, et al.
ALABAMA COALITION FOR EQUITY, INC.
v.
Fob JAMES, Jr., et al.
ALABAMA COALITION FOR EQUITY, INC.
v.
Fob JAMES, Jr., et al.
Deion HARPER, et al.
v.
Fob JAMES, Jr., et al.
Deion HARPER, et al.
v.
Fob JAMES, Jr., et al.
STATE SUPERINTENDENT OF EDUCATION and State Board of Education
v.
ALABAMA COALITION FOR EQUITY, INC., et al.
STATE SUPERINTENDENT OF EDUCATION and State Board of Education
v.
ALABAMA COALITION FOR EQUITY, INC., et al.
1960327, 1960328, 1960470 to 1960473, 1960489 and 1960490.
Supreme Court of Alabama.
December 12, 1997.
*940 Bill Pryor, atty. gen., and Brock B. Gordon, Mobile, for appellant Attorney General Bill Pryor.
M. Roland Nachman, Jr., Montgomery; and William P. Gray, Jr., legal advisor to the Governor for appellants Governor James and Finance Director Sage Lyons.
Michael R. White, general counsel, Department of Education; and Denise B. Azar and Ashley H. Hamlett, Office of General Counsel, Department of Education, for appellants State Superintendent of Education and State Board of Education.
Robert D. Segall of Copeland, Franco, Screws & Gill, Montgomery; and Christopher A. Hansen, American Civil Liberties Union Foundation, New York City, for Harper cross-appellants/appellees.
Reuben W. Cook, Alabama Disabilities Advocacy Program, Tuscaloosa, for Alabama Disabilities Advocacy Program and John Doe.
C.C. Torbert, Jr., of Maynard, Cooper & Gale, Montgomery; James Allen Main and L. Landis Sexton of Beasley, Wilson, Allen, Main & Crow, P.C., Montgomery; Michael D. Waters of Miller, Hamilton, Snider & Odom, Montgomery; and James G. Speake of Speake & Speake, Moulton, for appellees/cross appellants Alabama Coalition for Equity, Inc., et al.
COOK, Justice.
These cases arise out of the ongoing litigation known as the "Public School Equity Funding Case." See Ex parte James, 713 So.2d 869 (Ala.1997); Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995); Opinion of the Justices No. 338, 624 So.2d 107 (Ala.1993). They are appeals and cross appeals from a judgment of the Montgomery County Circuit Court awarding to the Alabama Coalition for Equity, Inc. ("ACE"), the Alabama Disabilities Advocacy Program ("ADAP"), and Mary Harper, the original plaintiffs in this action (collectively the "plaintiffs-cross appellants"), interim attorney fees, that is, fees for their efforts that culminated in the order entered in the Liability Phase. We affirm.
The judgment in the Liability Phase was entered on March 31, 1993. On June 9, 1993, the Honorable Eugene Reese, judge of the Montgomery County Circuit Court, acting pursuant to Ala. R. Civ. P. 54(b), certified that judgment as final. The same day, he entered a separate order stating in part:
"The plaintiffs are entitled and allowed their costs and expenses, including the award of reasonable attorneys' fees for the attorneys for the plaintiffs, in such amounts as the court shall hereafter determine upon application of the plaintiffs. The parties plaintiff may make application for interim attorneys' fees and interim costs and expenses by application to this *941 court, with notice to the parties defendant, on or before January 1, 1994, or upon application to this court, at some later date.
"This Order involves a final decision as to fewer than all of the claims of the plaintiffs, and there is no just reason for delay. Accordingly, pursuant to Rule 54(b) of the Alabama Rules of Civil Procedure, the court certifies this Order as a final judgment."
(Emphasis added.) No appeals were taken, either from the Liability Phase judgment, or, from the June 9, 1993, order involving attorney fees (the "Reese Fee Order").
In 1996, the plaintiffs-cross appellants petitioned the trial court for awards of attorney fees and expenses for their efforts through March 31, 1993, that is, for the litigation of the Liability Phase. On November 19, 1996, the Honorable Sarah M. (Sally) Greenhaw, judge of the Montgomery County Circuit Court, entered an order awarding fees in the amounts of $1,800,000; $1,564,375; and $235,360 to ACE, Harper, and ADAP, respectively (the "Greenhaw Fee Order"). Appeals and cross appeals followed. Appeals were filed in cases 1960327 and 1960328 by Governor Fob James, Jr.; State Finance Director Sage Lyons; and Attorney General Jeff Sessions (the "James Appellants"). Appeals were also filed in cases 1960489 and 1960490 by State Superintendent of Education Ed Richardson and the State Board of Education. Cross appeals were filed in cases 1960470 and 1960471 by ACE, and in cases 1960472 and 1960473 by Harper and ADAP.
On March 20, 1997, this Court issued an order to Judge Greenhaw, stating in pertinent part:
"It appearing to the Court that all claims have not been adjudicated, this cause is remanded to you for a determination as to whether to make the interlocutory order of November 19, 1996, awarding attorneys' fees, a final judgment pursuant to the provisions of Rule 54(b), Alabama Rules of Civil Procedure.
"If you elect to enter the 54(b) order, or any other final judgment, a supplemental record reflecting such action should be prepared and forwarded to this Court within fourteen (14) days from the date shown on this remand. The judgment will be considered final as of the date the new order is entered.
"Failure to respond to this remand within fourteen (14) days will result in dismissal of the appeal as being from a non-final order."
On March 26, 1997, Judge Greenhaw certified the Greenhaw Fee Order as a final judgment pursuant to Rule 54(b). We first address issues regarding the finality and appealability of these fee orders.

I. Finality and Appealability
At the outset, we note that none of the appellants challenges the specific amounts awarded the plaintiffs-cross appellants. They challenge only the entitlement vel non to an award of attorney fees in this action.

A. The Reese Fee Order
The appellants first contend that the Reese Fee Order was interlocutory and insist that, because it addressed only the liability for fees, but postponed until a future date the actual assessment of the fees, it was not such an order as could be made final pursuant to Rule 54(b). In other words, they contend, Rule 54(b) did not authorize the certification of the Reese Fee Order as a final judgment. We agree with this contention.
Not every order has the element of finality necessary to trigger the application of Rule 54(b). Tanner v. Alabama Power Co., 617 So.2d 656, 656 (Ala.1993) (Rule 54(b) "confers appellate jurisdiction over an order of judgment only where the trial court `has completely disposed of one of a number of claims, or one of multiple parties'" (emphasis in Tanner)). For the application of this rule in the specific context of an award of attorney fees, see Sidag Aktiengesellschaft v. Smoked Foods Products Co., 813 F.2d 81 (5th Cir.1987).
The Sidag case arose out of an action commenced in 1979 by Sidag Aktiengesellschaft and Sicilia di R. Biebow & Co. ("Sidag") against, among others, Smoked Foods Products Company and Sales U.S.A., Inc. *942 ("Sales"). Id. at 82. On September 19, 1984, following a number of judgments adverse to Sidag, a magistrate ordered Sidag to "`pay the expenses and attorneys' fees incurred by' Sales `in obtaining [an] Order of Dismissal [in that stage of the litigation] and in continuing to defend against Plaintiffs' claims since July 28, 1982.'" Id. at 83. At that time, however, the magistrate merely "directed Sales to submit by affidavit an itemized list of its said costs, expenses, and attorneys' fees [within] thirty days." Id. Nevertheless, by an order dated September 26, 1984, the magistrate attempted to certify the September 19 order as a final judgment, stating in part: "Pursuant to Fed. R. Civ. P. 54, the court now expressly determines that there is no just reason for delay and hereby directs entry of separate final judgment ... awarding said dismissed parties costs and attorneys' fees against plaintiffs in accordance with the Order... dated September 19, 1984...." Id.
On the appeal of the judgment of dismissal, the Court of Appeals for the Fifth Circuit "affirmed ... the dismissal of all claims against Sales." Id. "Thereafter, Sales filed in the district court its itemized costs, expenses, and attorneys' fees." Id. "Subsequently, the magistrate, by order dated August 28, 1986 and entered August 29, 1986, approved a portion of the attorneys' fees and expenses claimed by Sales, in various amounts totaling $27,365.32." Id. Although the August 28, 1986, order awarding a definite sum in attorney fees was never certified as final, Sidag appealed.
The Court of Appeals for the Fifth Circuit dismissed the appeal as being from an interlocutory order. Id. at 84. In doing so, it explained:
"Rule 54(b) certification has no purpose other than to make final a given adjudication which would otherwise be nonfinal by reason of, but only by reason of, the continued presence in the same suit of other undisposed of claims or parties. Only a fully adjudicated whole claim against a party may be certified under Rule 54(b). See Liberty Mutual Ins. Co. v. Wetzel, 424 U.S. 737, 742-44, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976).... If a purported Rule 54(b) certification of a ruling respecting a claim is not authorized by that rule, the certification is wholly ineffective....
"Here the magistrate's September 1984 Rule 54(b) certification purported to certify for appeal his ruling that Sidag was liable for Sales' attorneys' fees. The certification in respect to attorneys' fees was ineffective because the whole of Sales' claim against Sidag for attorneys' fees had not been adjudicated since the amount of recoverable fees remained undetermined (and, indeed, what the magistrate purportedly certified in this regard was not the whole attorneys' fees claim, but only the liability portion thereof).... Just as an order ... dismissing with prejudice all Sidag's claims against [one defendant] only, but not touching any of Sidag's claims against Smoked Foods or Sales' attorneys' fees claim against Sidag, would not be appealable in the absence of a Rule 54(b) certificate, so also the 1986 order fixing the amount of Sales' attorneys' fees was not appealable without such a certificate."
813 F.2d at 84 (emphasis in original; footnote omitted). See also Fort v. Roadway Express, Inc., 746 F.2d 744, 747 (11th Cir.1984) (an order "finding [a party] liable for fees without determining the amount thereof is not a final appealable judgment with regard to the issue of attorney's fees").
Sidag is substantively indistinguishable from this case. Both cases involve two separate attorney fee orders. There, as here, the trial court, in the first order, purported to certify a holding of fee liability without fixing the amount. In both cases, the trial court subsequently entered an order fixing the amount, but failed to certify the latter order as final pursuant to Rule 54(b). Here, as there, the order actually awarding fees was, without the requisite certification, not final and appealable. That, of course, is the reason this Court issued its March 20, 1997, order to Judge Greenhaw allowing further action.
In a related argument, the James Appellants contend that "even the liability order of March 31, 1993, was not a `final order'; could not be certified under Rule 54(b); and was not appealable to this Court, regardless of *943 such certification." Brief of [James] Appellants, at 9. In this way, theyonce again urge us to revisit and review the order entered in the Liability Phase, an order that became final pursuant to Rule 54(b) on June 9, 1993, and therefore appealable, and from which no appeal was taken.
This Court has been presented with arguments as to the reviewability of the Liability Phase judgment on no less than three prior occasions. First, Joyce Pinto and others (the "Pinto intervenors") strenuously urged us to review the Liability Phase on various grounds. Brief of Pinto Appellants (Case Nos. 1931030 & 1931031), at 41-49. We considered those arguments and rejected them without substantive discussion in Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 900 (Ala.1995). Second, soon after his election, "Governor James sought a writ of prohibition in this Court directing Judge Reese `to vacate his [order] ... of March 31, 1993.'" Id. at 898. "On April 10, 1995, we unconditionally denied the petition as it related to the [Liability Phase]." Id. In the order denying that relief, we explained clearly that the judgment in the Liability Phase became final and appealable on June 9, 1993, and that no appeal had been taken therefrom. Id. n.2. Third, in Ex parte James, 713 So.2d 869 (Ala.1997), both in briefs and in oral arguments, the James Appellants again urged us to review the Liability Phase. Most significantly, during the oral argument of that case, the James Appellants presented the identical argument now presented here, namely, that the Liability Phase judgment was a noncertifiable order and was, therefore, still reviewable.
In our opinion released on January 10, 1997, we clearly rejected that argument. Specifically, we stated: "[U]nlike the Liability Phase, which `ascertained and declared the rights of the parties,' Taylor v. Taylor, 398 So.2d 267, 269 (Ala.1981), by declaring the challenged system unconstitutional, and which became final on June 9, 1993, the Remedy Plan does not `ascertain[] and declare[] the rights of the parties and settle[] the equities' as to any party in this action." 713 So.2d at 873 (emphasis original). Justice Almon, in a special concurrence, explained even more succinctly:
"It is clear beyond question that the Liability Order became final under traditional, well-established principles of law. The following parties chose not to appeal from the Liability Order: then Governor of Alabama Guy Hunt; Speaker of the House of Representatives James Clark; then State Finance Director Robin Swift; and then Superintendent of Education Wayne Teague; and the members of the State Board of Education. It makes no legal difference to the finality of that order that other persons, who may disagree with that decision not to appeal, now hold those offices."
713 So.2d at 886-87 (footnote omitted).
The James Appellants rely on Tanner v. Alabama Power Co., 617 So.2d 656 (Ala. 1993). Tanner, however, is inapposite to this issue. That case involved premature "appeal[s] from an order of the Jefferson County Circuit Court granting an application of Alabama Power Company (`APCo') for condemnation of a right-of-way over the Tanners' property." 617 So.2d at 656. In that case, "[t]he trial judge, before determining the amount of damages, entered an order purporting to certify the order as a `final judgment' pursuant to Ala. R. Civ. P. 54(b)." Id.
This Court "dismiss[ed] the appeals as premature," holding that the failure of the trial court to assess the damages to which the Tanners were entitled rendered ineffective its Rule 54(b) certification. 617 So.2d at 657. For its rationale, the Court relied extensively on Ala. Code 1975, § 18-1A-289 (conditioning the condemnor's right to enter the property pending an appeal "upon the payment of the sum ascertained and assessed by the verdict of the circuit court, or the bond thereof in the circuit court for the defendant"); and § 18-1A-290 (requiring payment of "damages and compensation assessed at any time within 90 days after the assessment thereof, or, in case an appeal is taken, within 60 days after the appeal is determined"). 617 So.2d at 657. These statutes, the Court concluded, "`seemed clearly to indicate that the legislature intended that judgments in condemnation cases become final only after *944 assessment of damages.'" Id. (Emphasis added in Tanner.)
Indeed, the rule on which the James Appellants rely is properly stated as follows: "A judgment for damages to be final must ... be for a sum certain determinable without resort to extraneous facts." Jewell v. Jackson & Whitsitt Cotton Co., 331 So.2d 623, 625 (Ala.1976) (emphasis in original). Otherwise stated: "Where the amount of damages is an issue, ... the recognized rule of law in Alabama is that no appeal will lie from a judgment which does not adjudicate that issue by ascertainment of the amount of those damages." Moody v. State ex rel. Payne, 351 So.2d 547, 551 (Ala.1977) (emphasis added). The following cases clearly illustrate the application of this rule.
"Automatic" Sprinkler Corp. of America v. B. F. Goodrich Co., 351 So.2d 555 (Ala.1977), involved an action commenced by the B. F. Goodrich Company ("Goodrich") against H. K. Ferguson Company ("Ferguson") and "Automatic" Sprinkler Corporation of America ("A.T.O."), arising out of "a spill of a highly toxic environmental contaminant on [Goodrich's] premises." 351 So.2d at 556. Goodrich sought "damages" based on claims of "breach of contract, negligence, and breach of express and implied warranties." Id. (Emphasis added.) The trial court entered "partial summary judgments on the issue of liability against [Ferguson] and A.T.O." Id. (Emphasis added.) More specifically, the judgments stated: "The monetary amount of plaintiff's recovery shall be determined hereafter in these proceedings." Id. at 557. Although the judgments also contained the language required for Rule 54(b) certification, this Court held that they were nonfinal and nonappealable. Id. at 557. It explained "[t]hat a judgment is not final when the amount of damages has not been fixed by it." Id. (Emphasis added.)
Similarly, Alldridge v. Metro Bank, 398 So.2d 314 (Ala.Civ.App.1981), involved an action by Metro Bank, the holder of a security interest in a "boat, motor, and trailer," against Billy Joe Alldridge, who had purchased the chattels from Thurston Glaze, from whom Metro Bank had acquired its security interest. 398 So.2d at 315. Metro Bank claimed that Alldridge had "wrongfully detained" and converted its secured collateral. Pursuant to these claims, it sought compensatory and punitive damages. Id. The trial court entered a summary judgment in favor of Metro Bank. In its judgment, however, it expressly reserved for a "jury trial" the determination of the amount of the damages to be awarded. Id. at 316. The court entered a Rule 54(b) certification of finality.
The Court of Civil Appeals, however, held that the judgment was "not such a final judgment under [Rule] 54(b) as [would] support an appeal." 398 So.2d at 316. Citing "Automatic Sprinkler," the court explained that the purported Rule 54(b) certification was ineffective to "transform" the order determining liability into a final judgment, where the issue of damages had yet to be submitted to a jury. 398 So.2d at 317.
This Public School Equity Funding Case is qualitatively different from these "damages" cases and is subject to the well-established rule stated in Ex parte Elyton Land Co., 104 Ala. 88, 91, 15 So. 939, 940 (1894):
"The test of the finality of a decree to support an appeal is not whether the cause remains in fieri, in some respects, in the court of chancery, awaiting further proceedings, necessary to entitle the parties to the full measure of the rights it has been declared they have; but whether the decree which has been rendered, ascertains and declares these rightsif these are ascertained and adjudged, the decree is final and will support an appeal."
(Emphasis added.) The question in Elyton Land Co. was whether a decree entered in favor of Rebecca Denny, who had sought an assignment of her dower rights in real estate held by her late husband, was final and appealable. 104 Ala. at 91, 15 So. at 939-40. The Court noted that a number of issues remained to be determined, stating:
"Whether dower should be assigned by metes and bounds; or whether compensation should be decreed in lieu of such assignment; which of the defendants should be charged with the payment of rents, for what parts of the lands, and what portions; whether the rents should be computed on the basis of the enhanced *945 value of the lands because of the improvements, or without regard to such improvements, were incidents, consequential to the decree the court had rendered, adjudging that the complainant was entitled to be endowed of the lands; essential to the execution of that decree, and to confer upon her the possession and enjoyment of the rights, the decree adjudged she was entitled to have and enjoy."
104 Ala. at 91-92, 15 So. at 940 (emphasis added). However, the Court declared that the essential facts, the finding of which was necessary to the entry of a final decree, were: "the marriage, the seisin of the husband during coverture, his death and the possession of the lands, claiming to be tenants of the freehold, by the defendants charged to be in possession and so claiming." 104 Ala. at 90, 15 So. at 940. It explained: "These facts constitute the equity of the case; they embrace the substantial merits of the controversy; from them arise the material issues of fact and of law, upon which the legal and equitable rights of the parties depend." Id. Concluding that the "decree ascertaine[d] and declare[d] the concurrence and coexistence of [the essential] facts; and from them deduce[d] the legal conclusion," the Court held that the decree was final and appealable. 104 Ala. at 90, 91, 15 So. at 940.
This rule has been expressed and applied in recent cases. See, e.g., Taylor v. Taylor, 398 So.2d 267 (Ala.1981); McCulloch v. Roberts, 290 Ala. 303, 276 So.2d 425 (1973); Sexton v. Sexton, 280 Ala. 479, 482, 195 So.2d 531, 533 (1967); Newton v. Ware, 271 Ala. 444, 450, 124 So.2d 664, 669-70 (1960); Ellison v. Ellison, 628 So.2d 855 (Ala.Civ.App. 1993); Moore v. Casey, 439 So.2d 164 (Ala. Civ.App.1983); Wesley v. Brandon, 419 So.2d 257 (Ala.Civ.App.1982). In Newton, we said:
"Equity decrees may be partly final and partly interlocutory. A decree which ascertains and declares the rights of the parties and settles the equities is a final decree, although it provides for further proceedings under the direction of the court in order to carry the decree into effect. If there is a decree directing further proceedings under the direction of the court in order to make the final decree effective, such decree is interlocutory and remains within the control of the court because as to such decree and further proceedings thereunder the cause remains in fieri."
271 Ala. at 450, 124 So.2d at 670, quoted in Taylor and Sexton.
Even more significantly from the point of view of this case, "[i]n equity cases there can be more than one final judgment from which an appeal may be taken." Norris v. Norris, 406 So.2d 946, 948 (Ala.Civ. App.1981) (emphasis added); see also Chadwick v. Town of Hammondville, 270 Ala. 618, 621, 120 So.2d 899, 902 (1960). This is so because "there may remain ... other matters in which the equities have not been settled or proceedings necessary to enforce the judgment previously entered. A court has inherent power to issue such orders or process as necessary to render its judgment effective." 406 So.2d at 948; Monroe v. Monroe, 356 So.2d 196 (Ala.Civ.App.1978).
Indeed, the Liability Phase order of this "bifurcated" action falls within this latter rule. This is because the Liability Phase order did nothing more than declare the challenged statutory scheme unconstitutional, and, in doing so, put to rest these constitutional issues. In that respect, it differed not at all from the approach adopted in Rose v. Council for Better Educ., Inc., 790 S.W.2d 186 (Ky.1989), which the James Appellants, in Ex parte James, offered as exemplary of the proper judicial role. If the trial court, like the Rose court, had merely invalidated the statutory scheme and then abdicated any further role in favor of the legislature, no colorable argument could have been made that the declaratory judgment it entered was nonappealable.
That these "damages" cases, and the rule derived therefrom, are inapplicable to this case should be readily apparent. Unlike those cases, this case did not at any time anticipate the assessment of damages. It involved the plaintiffs' equitable and constitutional claims that Alabama's public school system "does not offer equitable and adequate educational opportunities to the schoolchildren of the state," as is constitutionally required, and the enforcement of the declaratory *946 and injunctive relief the plaintiffs requested. Opinion of the Justices No. 338, 624 So.2d 107, 110 (Ala.1993). The Liability Phase order, which formed the basis for the Reese Fee Order, was, therefore, a judgment that would support an appeal.

B. The Greenhaw Fee Order
Although we agree with the appellants that Rule 54(b) did not authorize the certification of the Reese Fee Order as a final judgment, we cannot conclude, as they urge us to do, that the noncertifiability of the Reese Fee Order provides a basis for a reversal of the Greenhaw Fee Order, which has now been properly certified in accordance with our March 20, 1997, order. Specifically, they contend that Judge Greenhaw erroneously concluded that she could not revisit the issue of the entitlement vel non to an award of attorney fees, believing, incorrectly, that the Reese Fee Order had become final and unchallenged by a timely appeal. Thus, they argue, because the Greenhaw Fee Order is based on a false premise, the judgment on which it is based must be reversed and the cause remanded for consideration as to whether the plaintiffs-cross appellants are, in fact, entitled to any award of fees. In support of this proposition, they cite the following portion of the Greenhaw Fee Order:
"This matter is before the court on applications for attorneys' fees and expenses filed by Plaintiffs' attorneys and Defendants' responses and opposition thereto. On March 31, 1993, the trial court entered judgment granting Plaintiffs injunctive and declaratory relief in what is commonly referred to as the `liability order.' On June 9, 1993, this order was made final pursuant to Rule 54(b), A.R.C.P. and the judgment was not appealed. On the same day a separate order was entered, which was also certified as a final judgment pursuant to Rule 54(b), A.R.C.P., and no appeal was taken from it. This order provided, in part:
"`8. The plaintiffs are entitled and allowed their costs and expenses, including the award of reasonable attorneys' fees for the attorneys for the plaintiffs, in such amounts as the court shall hereafter determine upon application of the plaintiffs ....'
"The threshold issue is whether this court has authority to award attorneys' fees pursuant to this order. As stated these orders were made final, which is in marked contrast to the October 22, 1993, Remedy Order wherein the court specifically retained jurisdiction over the matter. Furthermore, the Petition For Writ of Prohibition, Or Alternatively, For a Writ of Mandamus, filed by defendants did not include the above referenced June 9, 1993 order. That petition involved the orders of March 31, 1993, October 22, 1993 and December 3, 1993. Moreover, the Supreme Court of Alabama in its order of April 10, 1995 denying the petition, again determined that final orders not appealed within the time allowed cannot be considered by that Court. Finally, on April 18, 1996, the Supreme Court lifted its stay with regard to the issue of attorneys' fees. Based on the foregoing, this court is of the opinion the June 9, 1993 order allowing an award of attorneys' fees is final and a determination may be made regarding entitlement to such fees."
(Emphasis added.)
We disagree with the appellants' arguments for reversal on this ground, for two reasons. First, this Court has written: "`Judgments are to be construed like other written instruments.' Hanson v. Hearn, 521 So.2d 953, 954 (Ala.1988). `Rules applicable to the construction and interpretation of contracts are applicable to the construction and interpretation of judgments.' Id." Inter-Connect, Inc. v. Gross, 644 So.2d 867, 868 (Ala.1994). Simply stated, we construe the Greenhaw Fee Order as constituting an independent review of the Reese Fee Order.
Particularly significant is Judge Greenhaw's statement: "The threshold issue is whether this court has authority to award attorneys' fees pursuant to [the Reese Fee] [O]rder." (Emphasis added.) She followed up this statement with thorough analyses of various theories under which attorney fees might be awarded. Eventually, she concluded that she had authority to award fees to Harper and ADAP pursuant to the Civil *947 Rights Attorney Fee Act of 1976, 42 U.S.C. § 1988, and to ACE pursuant to the "common fund" theory.[1]
Moreover, the amounts she awarded were substantialtotalling $3,599,735. Had she not concluded, based on an independent assessment of the right to attorney fees, that her "court [had] authority to award attorneys' fees," regardless of the Reese Fee Order, she would, it seems likely, have awarded only nominal sums. Suffice it to say that these factorsher detailed analyses and the substantial amount of fees she ultimately awardedare entirely inconsistent with the appellants' construction of her order, namely, that it did not constitute an independent assessment of the entitlement. The language in the Greenhaw Fee Order on which the appellants rely may be regarded as harmless surplusage.
This conclusion is fully consistent with the well-established rule that "[a] correct decision will not be disturbed even if the court gives the wrong reasons." Davison v. Lowery, 526 So.2d 2, 4 (Ala.), cert. denied, 488 U.S. 854, 109 S.Ct. 140, 102 L.Ed.2d 113 (1988). See also Hood v. Wilson, 496 So.2d 76 (Ala.Civ.App.1986). Thus, to the extent the Greenhaw Fee Order is otherwise correct, we will not reverse it based on any misconception Judge Greenhaw may have had regarding the finality of the Reese Fee Order.

II. Section 1988 and Constitutional Bases for the Liability Phase Order
Judge Greenhaw's analysis of the theories under which the fees were sought and awarded began as follows:
"The attorneys claim fees under two different theories. The attorneys for the Alabama Coalition for Equity, Inc., (ACE) plaintiffs claim fees only under the common fund or benefit doctrine. The Harper attorneys contend they are entitled to fees under ... the common benefit doctrine and/or pursuant to 42 U.S.C. [§] 1988. The attorneys for the Alabama Disabilities Advocacy Program (ADAP) and John Doe plaintiffs claim fees only under Sec. 1988." Ultimately, she awarded fees on two of the theories argued by the parties. To ACE, she awarded fees pursuant to the "common fund" theory. To Harper and ADAP, she awarded fees pursuant to § 1988.
Section 1988(b) provides in pertinent part: "In any action or proceeding to enforce a provision of [42 U.S.C. §§] 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." (Emphasis added.) Section 1983 provides in pertinent part:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
Section 1983 is a procedural deviceone of those specifically set forth in § 1988by which the substantive rights guaranteed by the Constitution and statutes of the United States may be enforced. Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979); Sykes v. James, 13 F.3d 515 (2d Cir.1993), cert. denied, 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).
Section 1988 authorizes an award of attorney fees, "payable by the States when their officials are sued in their official capacities," Hutto v. Finney, 437 U.S. 678, 693-94, 98 S.Ct. 2565, 2575, 57 L.Ed.2d 522 (1978), and the action seeks prospective relief, id. at 695, 98 S.Ct. at 2576, from deprivations of rights guaranteed by the Constitution and statutes of the United States. A "prevailing party," within the meaning of § 1988, is one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 789, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989). The *948 threshold is met if the plaintiff can "point to a resolution of the dispute which changes the legal relationship between itself and the defendant." Id. at 792, 109 S.Ct. at 1493.
In this connection, Judge Greenhaw found that "[t]he ... plaintiffs in their complaints asserted federal constitutional claims under 42 U.S.C. [§] 1983." The pleadings and arguments of the parties bear out this finding. This action was initiated May 3, 1990, by ACE in a complaint seeking, among other things, a declaration that Ala. Const. 1901, amend. 111, violated "the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States in that it has a racially discriminatory purpose and effect." It also sought a judgment declaring that "[t]he statutes, procedures and administrative determinations constituting the State funding structure for public education in the state ... deprive[d] the individual plaintiffs... of their rights to equal protection and due process of law as guaranteed by the Fourteenth Amendment...." On May 23, 1991, ACE moved to amend its complaint, alleging that the "[d]efendants, acting under color of state statute, ordinance, regulation, custom or usage, [had] subjected plaintiffs to the deprivation of rights, privileges or immunities secured by the United States Constitution and laws." ACE further moved to "amend paragraph 1 of [its] complaint to add 42 U.S.C. § 1983 as a jurisdictional ground for this action."
ADAP moved to intervene in the action on August 2, 1990, with a "Proposed Complaint of Intervenor-Plaintiffs." In an accompanying affidavit, an ADAP representative stated: "Plaintiffs' complaint seeks, among other remedies, a declaration that the funding structure for public education in the State of Alabama violates the State and Federal constitutional and statutory rights of the plaintiffs to equal protection and due process of law." (Emphasis added.) The ADAP complaint alleged in part: "The education of exceptional students in Alabama has been traditionally underfunded in violation of the Constitution and laws of the State of Alabama. These concerns are inextricably intertwined with the issues raised by the pursuit of equal educational opportunities by the existing Plaintiffs in this lawsuit."
The Harper plaintiffs sued on January 18, 1991, in a complaint alleging violations of the United States Constitution. More specifically, it stated:
"This suit is a civil rights action arising under the Constitution of Alabama, art. XIV, § 256; art. I, §§ 1, 6, 13, and 22; the Fourteenth Amendment to the U.S. Constitution; and 42 U.S.C. §§ 1983 and 1988.... This suit is to redress the deprivation under color of State law of rights, privileges, and immunities secured to Plaintiffs by the Constitution and laws of the State of Alabama and the United States."

(Emphasis added.)
Indeed, the appellants do not challenge the sufficiency of the pleadings to invoke §§ 1983 and 1988. They merely contend that the Liability Phase order was based entirely on the Constitution of Alabama. We disagree with this contention.
To be sure, in the Liability Phase order the trial court held that the system by which Alabama administered its public schools violated "`Ala. Const. art. I, §§ 1, 6, 13, and 22 [guaranteeing Alabama citizens equal protection of the laws] and art. XIV, § 256 [guaranteeing Alabama citizens access to a "liberal system of public schools"].'" Pinto, 662 So.2d at 896. In order to reach this result, however, the trial court first had to resolve the issue whether, as the plaintiffs-cross appellants contended, Amendment 111 violated the Fourteenth Amendment of the United States Constitution. In order to illustrate the importance of this resolution, we must briefly discuss the texts and histories of § 256 and Amendment 111. Article 14, § 256, of the Alabama Constitution provides:
"The legislature shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years. The public school fund shall be apportioned to the several counties in proportion to the number of school children of school age therein, and shall be so apportioned to the *949 schools in the districts or townships in the counties as to provide, as nearly as practicable, school terms of equal duration in such school districts or townships. Separate schools shall be provided for white and colored children, and no child of either race shall be permitted to attend a school of the other race."
(Emphasis added.) Amendment 111, which was ratified in 1956, provides in pertinent part (as an amendment to § 256):
"It is the policy of the state of Alabama to foster and promote the education of its citizens in a manner and extent consistent with its available resources, and the willingness and ability of the individual student, but nothing in this Constitution shall be construed as creating or recognizing any right to education or training at public expense, nor as limiting the authority and duty of the legislature, in furthering or providing for education, to require or impose conditions or procedures deemed necessary to the preservation of peace and order.

"The legislature may by law provide for or authorize the establishment and operation of schools by such persons, agencies or municipalities, at such places, and upon such conditions as it may prescribe, and for the grant or loan of public funds and the lease, sale or donation of real or personal property to or for the benefit of citizens of the state for educational purposes under such circumstances and upon such conditions as it shall prescribe. Real property owned by the state or any municipality shall not be donated for educational purposes except to nonprofit charitable or eleemosynary corporations or associations organized under the laws of the state.
"To avoid confusion and disorder and to promote effective and economical planning for education, the legislature may authorize the parents or guardians of minors, who desire that such minors shall attend schools provided for their own race, to make election to that end, such election to be effective for such period and to such extent as the legislature may provide."
(Emphasis added.)
Amendment 111, on its face, purported to abrogate the provision of § 256 requiring the legislature to "establish, organize, and maintain a liberal system of public schools throughout the state." In its place, it proposed to vest in the legislature absolute discretion as to the relative amounts of funding, if any, it would make available to the public schools in this state.
On January 22, 1991, and March 21, 1991, ACE and Harper, respectively, moved for summary judgments on their claims that Amendment 111 violated the Fourteenth Amendment. They supported their motions with briefs and extensive materials, including affidavits, which asserted, among other things, that Amendment 111 was submitted by the legislature in opposition to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (racial segregation in public schools violates the Fourteenth Amendment). On August 13, 1991, Judge Reese entered an order holding:
"1. Amendment 111 ... of the Alabama Constitution is declared and hereby is void ab initio and in its entirety under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

"2. The mandate of Section 256 of the Alabama Constitution of 1901 is declared, and hereby is, in effect to the extent that it provides: `The legislature shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years.' The second and third sentences of Section 256 of the Alabama Constitution of 1901 are declared to be without force or effect under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution."

(Emphasis added; footnotes omitted.) On October 18, 1991, the trial court certified the August 13, 1991, judgment as final pursuant to Rule 54(b). That judgment, like the March 31, 1993, Liability Phase judgment, was never appealed.
In support of their contentions that the Liability Phase judgment was based entirely on the Constitution of Alabama, the appellants quote a portion of the Liability Phase judgment, stating: "Each of the state law *950 holdings in this decision `rest[s] on an adequate and independent state ground.'" (Quoted in Opinion of the Justices No. 338, 624 So.2d 107, 165 (Ala.1993)). Whatever may be the import of that statement in the context in which it appeared, it does not support the proposition for which it is quoted by the appellants. On the contrary, the only basis for its holding that the system by which Alabama administered its public schools violated §§ 1, 6, 13, 22, and 256 of the Alabama Constitution was its holding that Amendment 111 was unconstitutional, and, therefore, inapplicable. Had it held otherwise, the trial court would then have been unable to locate any principle of logic or constitutional construction of which we are aware that would have enabled it to circumvent the specific provisions of Amendment 111nullifying the mandate of § 256and, thereby, to reach the result obtained in the Liability Phase. In a real sense, the court's holding that Amendment 111 violated the Fourteenth Amendment is the linchpin of this entire action. We hold, therefore, that the plaintiffs-cross appellants, who prevailed on this pivotal question of federal constitutional law as the basis for the entire action, are entitled to an award of attorney fees, pursuant to § 1988. See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989).
The James Appellants cite Ala. Const. 1901, § 14, which provides "[t]hat the State of Alabama shall never be made a defendant in any court of law or equity." They insist that § 14 "bars any award of attorneys' fees against the State of Alabama in favor of any of the plaintiffs-appellees in this action." However, as we have stated previously in this opinion, the doctrine of State sovereign immunity does not bar an award of attorney fees pursuant to §§ 1983 and 1988. Hutto v. Finney, 437 U.S. 678, 693-94, 98 S.Ct. 2565, 2575, 57 L.Ed.2d 522 (1978). For these reasons, the trial court did not err in awarding fees pursuant to § 1988.

III. Applicability of the Common-Fund Doctrine

A. Harper and ADAP
In the trial court, Harper and ADAP sought fee awards under two theories: (1) § 1988, and (2) the common-fund/benefit theory. "The `common fund' doctrine is an equitable principle designed to compensate an attorney whose services on behalf of his client created a fund to which others may also have a claim." City of Ozark v. Trawick, 604 So.2d 360, 364 (Ala.1992).
The trial court awarded these parties fees only pursuant to § 1988. Harper and ADAP do not challenge the amount of fees awarded; rather, they cross appeal only on the issue whether the trial court erred in refusing to base its award on the common-fund/benefit theory. We conclude that the trial court did not err in this respect.
"The recovery of attorney fees in Alabama is allowed `only where authorized by statute, when provided in a contract, or by special equity, such as in a proceeding where the efforts of an attorney create a fund out of which fees may be paid.'" Wiberg v. Sadoughian, 514 So.2d 940, 941 (Ala.1987) (emphasis added) (quoting Eagerton v. Williams, 433 So.2d 436, 450 (Ala.1983)). However, when a statute is applicable, fees should be awarded pursuant to the statutenot pursuant to a judicially created exception to the general rule. Northcross v. Board of Educ. of the Memphis City Schools, 611 F.2d 624 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 3000, 64 L.Ed.2d 862 (1980). Congress's enactment of § 1988 "did more than simply enable the lower courts once again to award fees." Id., 611 F.2d at 632. "[R]ather than being an equitable remedy, flexibly applied in those circumstances which the court considers appropriate, it is now a statutory remedy, and the courts are obligated to apply the standards and guidelines provided by the legislature in making an award of fees." Id. (emphasis in original). Thus, because § 1988 is applicable to the claims of Harper and ADAP for attorney fees, the trial court did not err in refusing to consider alternative grounds for awards to those parties.

B. ACE
ACE's cross appeal presents two issues not presented in the cross appeals of Harper *951 and ADAP. First, the award to ACEunlike the awards to Harper and ADAPwas based, not on § 1988, but on the common-fund theory. The trial court concluded that a "common fund ha[d] been created," which fund was "comprised," it held, "of $18,300,000.00 [in] reallocation of funds to the ACE Plaintiffs' school systems from the 1994-1995 education appropriations." The court then held that ACE was entitled to $1,800,000, that is, approximately 10% of the $18,300,000.
Second, unlike Harper and ADAP, ACE does contend that its award was inadequate. In other words, it contends that it was due a larger percentage of a larger "common fund." Specifically, it contends that a common fund was created in an amount no less than $105,000,000 and that it was entitled to no less than 15% of that amount.
However, § 1988 is as applicable to the claims of ACE as it is to the claims of Harper and ADAP. The reasons why the award to ACE was not based on § 1988as were those of Harper and ADAPdo not appear to us in the Greenhaw Fee Order, or anywhere else. Indeed, the § 1983 and Fourteenth Amendment bases of the claims underlying the Liability Phase order were stated even more cogently in the pleadings of ACE than in those of the other plaintiffs-cross appellants. Because § 1988 was applicable, the fees should have been awarded under the statutory theory. Northcross v. Board of Educ. of Memphis City Schools, 611 F.2d 624 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 3000, 64 L.Ed.2d 862 (1980). Nevertheless, the record would fully support an award to ACE of $1,800,000 under § 1988.[2]

IV. Conclusion
We have considered all arguments of the parties and find no reason to reverse the judgment. Therefore, the judgment is affirmed.
1960327AFFIRMED.
1960328AFFIRMED.
1960470AFFIRMED.
1960471AFFIRMED.
1960472AFFIRMED.
1960473AFFIRMED.
1960489AFFIRMED.
1960490AFFIRMED.
ALMON, SHORES, and KENNEDY, JJ., concur.
SEE, J., concurs in the result.
HOOPER, C.J., and MADDOX and HOUSTON, JJ., concur in the result but dissent from the rationale.
BUTTS, J., recuses himself.
MADDOX, Justice (concurring in the result but dissenting from the rationale).
No attorney for the plaintiffs or intervenors is entitled to attorney fees under 42 U.S.C. § 1988. To the extent the main opinion would authorize the payment of attorney fees under § 1988, I disagree with that opinion, and I specifically dissent from the reasoning of that portion of the opinion.
For the following reasons, I would affirm the trial court's determination that the attorneys for the plaintiffs-cross appellants are entitled to the attorney fees awarded, even though I disagree with the grounds used by the trial court and by today's main opinion to support the awards.[3]
Alabama generally follows the "American rule," which authorizes an award of attorney fees if they are provided for by statute or by contract, or when they are called for by a special equity, such as when litigation results in a benefit to the general public. See, Battle v. City of Birmingham, 656 So.2d 344 (Ala.1995), where the plaintiff contended that the public nature of the services rendered by her attorneys justified an award of attorney *952 fees, relying on Bell v. Birmingham News Co., 576 So.2d 669 (Ala.Civ.App.1991), and Brown v. State, 565 So.2d 585 (Ala.1990), in which an award of attorney fees was allowed, even though there was no common fund from which to pay them, because the litigation had resulted in a benefit to the general public. See, also, City of Ozark v. Trawick, 604 So.2d 360 (Ala.1992); Reynolds v. First Alabama Bank of Montgomery, N.A., 471 So.2d 1238 (Ala.1985); Shelby County Commission v. Smith, 372 So.2d 1092 (Ala.1979); and State ex rel. Payne v. Empire Life Ins. Co. of America, 351 So.2d 538 (Ala.1977).
In Battle, the plaintiff sued to enjoin what she claimed was an improper practice by the City in allowing a waste disposal company to construct and potentially operate a garbage transfer facility in violation of the City's zoning laws; the zoning laws required the approval of the Birmingham Planning Commission and the Birmingham City Council in order for the company to construct and operate the facility. She claimed that her lawsuit had resulted in a benefit to the general public. This Court stated the law as follows:
"Whether to award or to deny attorney fees lies within the sound discretion of the trial court. On appeal, the trial court's ruling on that question is subject to reversal only upon a showing of abuse of discretion. Advertiser Co. v. Auburn University, 579 So.2d 645 (Ala.Civ.App.1991).
"Alabama follows the `American rule,' whereby attorney fees may be recovered if they are provided for by statute or by contract or if they are called for by special equity, such as in proceedings where the attorney's efforts create a `common fund' out of which fees may be paid. Reynolds v. First Alabama Bank of Montgomery, N.A., 471 So.2d 1238 (Ala.1985). As noted above, under the principles stated in [Bell v. Birmingham News Co., 576 So.2d 669 (Ala.Civ.App.1991), and Brown v. State, 565 So.2d 585 (Ala.1990)], the fact that litigation has not produced a monetary recovery does not preclude an award of attorney fees, if the litigation results in a benefit to the general public."
656 So.2d at 347.
This Court, in Reynolds, and Brown, supra, extended the "special equity" rule to apply to situations where litigation resulted in a benefit to the general public; in Brown it quoted Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391-93, 90 S.Ct. 616, 625-26, 24 L.Ed.2d 593 (1970), and held as follows:
"`While the general American rule is that attorney's fees are not ordinarily recoverable as costs, both the courts and Congress have developed exceptions to this rule for situations in which overriding considerations indicate the need for such a recovery. A primary judge-created exception has been to award expenses where a plaintiff has successfully maintained a suit, usually on behalf of a class, that benefits a group of others in the same manner as himself.
"`....
"`The fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on this rationale. Although the earliest cases recognizing a right to reimbursement involved litigation that had produced or preserved a "common fund" for the benefit of a group, nothing in these cases indicates that the suit must actually bring money into the court as a prerequisite to the court's power to order reimbursement of expenses. "The foundation for the historic practice of granting reimbursement for the cost of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation. Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 166, 59 S.Ct. 777 [780], 83 L.Ed. 1184, 1187 (1939)." ...'
"This litigation clearly resulted in a benefit to the general public. It is unquestionable that plaintiffs' attorneys rendered a public service by bringing an end to an improper practice. The public nature of the services rendered by these lawyers justifies an award of attorney fees. See Callahan v. Wallace, [466 F.2d 59 (5th Cir.1972)], at 62."
Brown, 565 So.2d at 592.
In view of the principles of law this Court has set forth in the cases cited above, it appears to me that this State has adopted a rule that has been described as "one of equitable sharing according to the benefit, and not the presence of a fund vel non." James W. Moore, Moore's Federal Practice, 6 *953 § 54.78[3] (2d ed.1996). I believe that rule is particularly applicable in this case, which involves an issue of the right of a child to a public education, a right included in every state constitution since Alabama became a state, but, unfortunately, a right that has become embroiled in a debate about the doctrine of separation of powers among coordinate, independent branches of state government and about whether certain orders were "final" or not. Rule 1(c), Ala. R. Civ. P., states that the Rules of Civil Procedure "shall be construed and administered to secure the just, speedy and inexpensive determination of every action." Rule 1(c) would seem to be particularly applicable here, given that this case has been pending for years; that the original state defendants did not appeal; that the Alabama Senate asked the Justices of this Court, as it was then constituted, for an advisory opinion, which the Justices gave; and that a majority of this Court has refused to overturn the liability order.
Therefore, I would affirm the trial court's award of $1,800,000 to the attorneys for ACE; $1,564,375 to the attorneys for Harper; and $235,360 to the attorneys for ADAP. Thus, I concur in the result.
HOOPER, C.J., and HOUSTON, J., concur.
NOTES
[1] These theories we discuss in more detail in another section of this opinion.
[2] It is well settled that "[a] correct judgment ... will not be reversed even if the trial court has based it on the wrong reasons." Smith v. Scott Paper Co., 620 So.2d 976, 977 (Ala.), cert. denied, 510 U.S. 867, 114 S.Ct. 189, 126 L.Ed.2d 148 (1993).
[3] "A correct decision will not be disturbed even if the court gives the wrong reasons." Davison v. Lowery, 526 So.2d 2, 4 (Ala.1988).